# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TAMPA MARITIME ASSOCIATION-INTERNATIONAL LONGSHOREMEN'S ASSOCIATION PENSION PLAN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>GENERAL ELECTRIC COMPANY, JEFFREY R. IMMELT, JEFFREY S. BORNSTEIN, JOHN L. FLANNERY, and JAMIE MILLER,<br><br>Defendants. | **CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Tampa Maritime Association-International Longshoremen's Association Pension Plan ("TMA-ILA" or "Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based on personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based upon the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by General Electric Company ("General Electric" or the "Company"), as well as conference call transcripts and media and analyst reports about the Company.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.      This is a class action brought on behalf of all persons or entities who purchased or otherwise acquired the publicly traded securities of General Electric between December 15, 2016 and November 10, 2017, inclusive (the "Class Period").  The action is brought against General Electric and certain of the Company's current and former senior executives (collectively, "Defendants") for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule l0b-5 promulgated thereunder.

2.      General Electric is a multi-national conglomerate with operations that are organized across various business segments, specifically including: (1) GE Power, a wholly-owned subsidiary of General Electric, that builds industrial products including power plants, turbines, and generators, (2) GE Capital, the financial services unit of General Electric that provides commercial lending and leasing, as well as a range of financial services for commercial aviation, energy, and support for General Electric's industrial business units, and (3) Oil & Gas, which includes General Electric's 62.5 percent stake in Baker Hughes, a GE Company ("Baker Hughes"), an oilfield services company that engages in drilling and oil pipeline operations.[1]  These segments generated roughly 30 percent, 10 percent, and 9 percent of the Company's total 2016 revenues, respectively.  Founded in 1892, the Company is headquartered in Boston, Massachusetts and trades on the NYSE under the ticker symbol "GE."

---

[1]      The remaining 37.5 percent of Baker Hughes is publicly traded on the New York Stock Exchange ("NYSE") under the ticker symbol "BHGE."

3.      Historically, General Electric has been known as a "dividend stock," as investors looked to General Electric for a consistent stream of quarterly dividends.  Most recently, General Electric paid out approximately $2 billion in quarterly dividends since 2013.  Flow-through dividend payments from GE Capital to parent General Electric have provided the Company with a majority of the cash flow used for dividends paid to General Electric shareholders.

4.      GE Capital historically underwrote and reinsured billions of dollars in long-term care ("LTC") policies.  Under these LTC policies, GE Capital collects premiums to insure costs associated with assisted living and other related expenses that are not covered by traditional insurance.  Generally Accepted Accounting Principles ("GAAP") and SEC rules governing corporate disclosures require insurance companies to collect and review claims experience and other data to set appropriate cash reserves for anticipated insurance claims.  GAAP requires long-term care insurance companies to review a handful of key factors regularly, including mortality rates and health care costs, and to account for these trends in updating cash reserves to fulfill LTC claims.

5.      This securities class action centers on General Electric's failure to disclose that: (1) the Company's various operating segments, including the Power and Oil & Gas segments, were underperforming Company projections, with order drops, excess inventories and increased costs; (2) GE Capital's long-term care reserves were understated by billions of dollars in violation of GAAP; (3) by materially under-reserving for liabilities related to GE Capital's legacy long-term care reinsurance policies, General Electric was able to maintain cash flow for its quarterly dividend payments; and (4) as a result of the foregoing, General Electric materially overstated its earnings and cash flows during the Class Period.  As a result of this deception,

General Electric common stock traded at artificially inflated prices, reaching a Class Period high of more than $31.92 per share on December 19, 2016.

6. Specifically, during the Class Period, General Electric touted the strength of its Power Segment and provided false assurances of GE Capital's cash flow position notwithstanding GE Capital's failure to accrue sufficient LTC reserves. For example, on July 21, 2017, the Company asserted that "[w]e have created a very strong position in Power" and "expect cash flow to continue to improve throughout the year."

7. Then, on October 20, 2017, the Company disclosed quarterly results for the third quarter 2017, disclosing earnings per share ("EPS") of $0.29, falling below estimates of $0.49 per share. The Company also lowered 2017 earnings expectations, lowering EPS to $1.05-$1.10 from $1.60-$1.70. New Chief Executive Officer ("CEO") John L. Flannery attributed the disappointing results to GE's Power segment, stating that General Electric's Cash Flow from Operating Activities ("CFOA") was primarily down due to "***lower than anticipated Power volume which was resulted in lower earnings and higher inventory*** . . . ."[2] Then-Chief Financial Officer ("CFO") Jeffrey S. Bornstein also provided additional details regarding the Company's LTC reserves within the GE Capital segment, stating "we have recently observed elevated claims experience for a portion of the long-term care [portfolio] at GE Capital's legacy insurance business, which represents $12 billion or roughly 50% of our insurance reserves." The Company also stated it began a comprehensive review in the third quarter of premium deficiency assumptions that are used in the annual claims reserve adequacy test and until the review has been completed, Defendants have "***deferred the decision to pay approximately $3***

---

[2]    Unless otherwise noted, all emphasis is added.

4

*billion of additional GE Capital dividends*" to General Electric.  Year to date, GE Capital has paid $4 billion of dividends to General Electric.

8.      On this news, the Company's stock price fell $1.51 per share, or nearly 7 percent, to close at $22.32 per share on October 23, 2017.

9.      Finally, on November 13, 2017, the first day of trading after the end of the Class Period, General Electric held an Investor Update and shocked the market by slashing its annual dividend in half, from $0.96 to $0.48 per share, representing only the second dividend cut by the Company since the Great Depression.  Plagued by poor cash flow, CEO Flannery further explained General Electric had been paying out a dividend above its industrial free cash flow for a number of years, and that GE Capital would not be paying a dividend to General Electric in 2018.

10.      On this news, General Electric's stock price fell $1.47 per share, or over 7 percent,  to close at  $19.02 per share on November 13, 2017.

11.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

13.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

14.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) as Defendants conduct business in this District, and a significant portion of

the Defendant's actions, and the subsequent damages, took place within this District.  General Electric's stock trades on the NYSE, located within this Judicial District.

15.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

16.     Plaintiff TMA-ILA, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased General Electric securities during the Class Period and was damaged as the result of Defendants' wrongdoing as alleged in this complaint.

17.     Defendant General Electric is incorporated in New York and its headquarters are in Boston, Massachusetts.  General Electric is a global digital industrial company with products and services ranging from aircraft engines, power generation, and oil and gas production equipment to medical imaging, financing and industrial products.  General Electric's common stock trades on the NYSE under the symbol "GE."

18.     Defendant Jeffrey R. Immelt ("Immelt") was the Chairman of the Company's Board from September 2001 to October 2, 2017 and the Company's Chief Executive Officer ("CEO") from September 2001 through August 1, 2017.

19.     Defendant Jeffrey S. Bornstein ("Bornstein") served as the Company's Chief Financial Officer from July 1, 2013 to November 1, 2017.

20.     Defendant John L. Flannery ("Flannery") served as the Company's CEO from August 1, 2017 through the end of the Class Period and as the Company's Chairman from October 2, 2017 through the end of the Class Period.  Previously, Flannery served as the CEO and President of GE Healthcare Ltd. from October 2014 to June 12, 2017.

21.     Defendant Jamie Miller ("Miller") served as the Company's CFO from November 1, 2017 through the end of the Class Period.

22.     Defendants Immelt, Bornstein, Flannery, and Miller are collectively referred to hereinafter as the "Individual Defendants."   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of General Electric's reports to the SEC, press releases, and presentations to securities analysts, money portfolio managers and institutional investors, *i.e.*, the market.   The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.   The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

23.     General Electric and the Individual Defendants are referred to herein, collectively, as "Defendants."

### SUBSTANTIVE ALLEGATIONS

### Company Background

24.     General Electric is a multi-national conglomerate with operations that are organized across various business segments, including GE Power, GE Capital, and Oil & Gas. General Electric is known as a "dividend stock," as investors look to General Electric for its steady stream of dividend payments.   Most recently, each quarter between the first quarter of

2013 and the third quarter of 2017, General Electric paid out approximately $2 billion in dividends.

**GE Power**

25.     GE Power, a wholly-owned subsidiary of General Electric, builds industrial products including power plants, turbines, and generators.  GE Power serves power generation, industrial, government and other customers around the world with products and services related to energy production.  The Company's products and technologies harness resources, such as oil, gas, coal, diesel, and nuclear to produce electric power and include gas and steam turbines.

**GE Capital**

26.     GE Capital, another wholly-owned subsidiary, is General Electric's financial services unit and provides lending and leasing opportunities to customers in the aviation, energy, and industrial sectors. Flow-through dividends from GE Capital provide General Electric with a majority of its cash flows used for dividends to General Electric shareholders. For example, General Electric's first quarter 2017 CFOA was $1.6 billion, including a $2 billion GE Capital dividend, while its second quarter 2017 CFOA was $3.5 billion, including a $2 billion GE Capital dividend.  Accordingly, robust GE Capital dividend payments have allowed General Electric to pay consistent dividends to General Electric shareholders.

27.     GE Capital also includes LTC insurance policies.  General Electric historically underwrote and reinsured billions of dollars in LTC policies.   Under these policies, General Electric collects premiums to insure costs associated with assisted living and other related expenses that are not covered by traditional insurance.  LTC providers hold money in reserves to pay off current and future claims on their policies.  Insurance regulations and GAAP require long-term care insurers to hold sufficient cash reserves and book related liabilities for

anticipated claims. The proper level of reserves is based on a handful of key factors including mortality rates and health care costs. GE Capital purportedly regularly reviews the adequacy of its long-term care reserves.

28.     In 2004, General Electric divested much of its legacy LTC policies when it spun-off Genworth Financial, Inc. ("Genworth"). Since that time, the pricing assumptions in the issuance of the LTC policies have changed dramatically, caused by certain factors such as increased costs of healthcare in the U.S., lengthened life expectancy models, and lower than expected interest rates. As a result of the foregoing, other significant insurance companies, such as MetLife, Prudential, and Unum Group, incurred significant losses caused by outdated LTC origination assumptions. In fact, a securities class action lawsuit was commenced against Genworth in 2014 relating to inadequate cash reserves on LTC policies. This lawsuit ultimately settled in early 2016 for $219 million, at which point, Genworth increased its LTC reserves by $435 million after an actuarial review.

29.     To date, General Electric has been unable to sell off GE Capital's remaining $28 billion in insurance liabilities, including reinsurance on LTC policies. GE Capital last increased these reserves by approximately $100 million after an actuarial review in mid-2016.

**Oil & Gas**

30.     At the end of October 2016, the Company announced that General Electric was under negotiations for a deal valued at about $30 billion to combine General Electric's Oil and Gas segment with oilfield services firm Baker Hughes. General Electric's Oil & Gas segment was primarily known as an equipment manufacturer, while Baker Hughes specializes in services like horizontal drilling and hydraulic fracturing.

31.     On July 3, 2017, the transaction combining both entities was formally completed. General Electric's Oil & Gas segment now includes General Electric's 62.5 percent stake in Baker Hughes.  The remaining 37.5 percent of Baker Hughes is publicly traded on the NYSE under the ticker symbol "BHGE."  However, after the expiration of the merger agreement's two-year lockup period in July 2019, General Electrical will be permitted to sell Baker Hughes.

**Defendants' False and Misleading Statements and Disclosures**

32.     The Class Period begins on December 15, 2016.  On December 14, 2017, after the market closed, General Electric held its Annual Outlook Investor Meeting with analysts. During the conference call, General Electric provided the following 2017 financial forecasts: Earnings Per Share ("EPS") of $1.60 to $1.70 and GE Capital dividend of $6 billion to $7 billion.  During the call, CEO Immelt claimed this guidance was supported by a "***very strong pipeline not just in the Power business but across the portfolio*** . . ."

33.     During the same call, a JPMorgan analyst noted that the "$6 billion to $7 billion GE Capital dividends to [GE]" was a "little bit below what [GE] had initially laid out," and expressed concern regarding anticipated cash flows and dividends from GE Capital. In response, CFO Bornstein suggested that dividends were sustainable by stressing that GE Capital was performing well on cash flows, stating: "We pulled dividends [from 2017] into 2016.  We are actually several billion dollars ahead of the plan that we gave you, we are not behind plan."

34.     On January 20, 2017, General Electric held a conference call with analysts and investors to discuss the Company's fourth quarter  and annual 2016 financial results.  During the call, CFO Bornstein reiterated the prior 2017 EPS, CFOA, and dividend guidance and underscored strong growth in GE Power, stating:

> ***Our outlook for Power remains consistent with the expectations shared at the outlook meeting***, albeit off a lower base.  As we said in December we expect double-digit earnings growth in Power in 2017.

10

35.     On the same call, in an exchange with a Sanford C. Bernstein analyst, CEO Immelt explained that cash flow would be improved by selling off aging inventory:

> **[Analyst]:** [M]aybe just talk a little more about the cash flow initiative comp that really can give investors confidence that the cash flow part of the story is improving."

> **[Defendant Immelt]:** [T]he one piece that we're still not happy with in terms of Q4 is inventory . . . .  We expect inventory to go down $2 billion next year.  And we think *that's going to give us a ton of momentum as it pertains to CFOA and working capital in 2017*.

36.     On February 24, 2017, the Company filed its annual report for the year ended December 31, 2016 on a Form 10-K with the SEC (the "2016 10-K").  The 2016 10-K was signed by the Company's then-CEO Immelt, and Bornstein, the Company's CFO.  The Form 10-K stated the Company's financial results and financial position.  In addition, the Form 10-K contained signed certifications pursuant to Sarbanes–Oxley Act ("SOX") by Immelt and Bornstein.  The SOX certifications stated that the financial information contained in the 2016 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.  Specifically, the certifications represented that the 2016 10-K did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."  The certifications also stated that Immelt and Bornstein had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information" and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control

over financial reporting."   Immelt's and Bornstein's statements were attributable to the Company.

37.    On March 8, 2017, General Electric held its Power & Renewable Energy Investor Meeting.   During the meeting, CFO Bornstein reiterated the strength of General Electric's Power segment, stating "*[w]e feel really good about the Power business* and what is otherwise a pretty flat market and a really tough set of geographies."   CFO Bornstein also repeated the Company's confidence in 2017 free cash flow:

> No change on free cash flow or cash flow, $16 billion to $20 billion, with *industrial CFOA embedded in there of $12 billion to $14 billion and no change on overview on what is going to get returned to investors* . . . .

38.    On April 21, 2017, General Electric held a conference call with analysts and investors to discuss the Company's first quarter 2017 financial results.   During the call, CFO Bornstein continued to tout the Company's Power segment, stating:

> In Power, we didn't collect on several delinquent accounts in tough regions around the world, but we expect to collect these throughout the rest of the year, including in the second quarter . . . .   *Power had a very strong organic growth quarter* on higher Aero turbines and higher gas turbine shipments . . . .   Our view for the year of mid-single-digit organic growth has not changed.

39.    Also during call, the Company claimed it would still deliver on its fiscal year ("FY") 2017 free cash flow guidance, despite delivering negative industrial CFOA for the quarter.   CFO Bornstein stated:

> [O]ur industrial CFOA was at $1.6 billion usage of cash, about $1 billion below our expectations.   We expect to see most of this come back over the remainder of the year, and *we see no change for our outlook for the year of $12 billion to $14 billion of industrial CFOA*.

40.    Despite these poor results, CEO Immelt emphasized that GE still posted a net positive CFOA figure, aided by a GE Capital dividend, stating:

On cash, we have CFOA of $400 million.  This included a dividend from GE Capital of $2 billion.  Industrial CFOA was a negative $1.6 billion . . . .  Cash is lumpy, and we expect to have a strong second quarter.

* * *

GE Capital paid $2 billion of dividends during the quarter and an additional $2 billion this week. We remain on track for $6 billion to $7 billion of dividends for the total year.

41.     On May 5, 2017, the Company filed its quarterly report for the period ended March 31, 2017 on a Form 10-Q with the SEC (the "2017 1Q 10-Q").  The 2017 1Q 10-Q stated the Company's financial results and financial position.  In addition, the 2017 1Q 10-Q contained signed certifications pursuant to SOX by Immelt and Bornstein.  The SOX certifications stated that the financial information contained in the 2017 1Q 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.  Specifically, the certifications represented that the 2017 1Q 10-Q did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."  The certifications also stated that Immelt and Bornstein had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information" and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting."  Immelt's and Bornstein's statements were attributable to the Company.

42.     On July 21, 2017, General Electric held a conference call with analysts and investors to discuss the Company's second quarter 2017 financial results.  During the call, CFO

Bornstein stated that General Electric was "trending to the bottom end of the $12 billion to $14 billion range on CFOA, driven by pressure, principally in Power and Oil & Gas." Despite the proclaimed "down market" in Power, CEO Immelt asserted that the Company would meet its "target of $17.2 billion for Industrial EBIT . . ., even with those headwinds" and also stressed that *"[w]e have created a very strong position in Power* . . . . We don't like the current oil and gas cycle, but our business is significantly improved and will prosper as the cycle recovers."

43.     On the same day, CEO Immelt stated that "*[w]e expect cash flow to continue to improve throughout the year*." CFO Bornstein echoed this optimism regarding free cash flow, stating:

> "We had a better cash quarter. CFOA was $3.5 billion, including a $2 billion dividend from GE Capital. Industrial CFOA was $1.5 billion in the quarter . . . . *We expect substantial improvement in cash in the second half*, driven by higher earnings, continued working capital improvement on higher shipments . . . ."

44.     However, during this call, the Company also revealed a looming issue at GE Capital, but did not provide context as to the scope of the problem: "We recently have had adverse claims experience in a portion of our long-term care portfolio and we will assess the adequacy of our premium reserves. We will update you in the fourth quarter." On this news, the Company's stock price fell $0.78 per share, or 2.9 percent, to close at $25.91 per share on July 21, 2017.

45.     Despite these limited disclosures regarding GE Capital's LTC portfolio, Defendants continued to make false and misleading statements to the market. On July 28, 2017, the Company filed its quarterly report for the period ended June 30, 2017 on a Form 10-Q with the SEC (the "2017 2Q 10-Q"). The 2017 2Q 10-Q stated the Company's financial results and financial position. In addition, the 2017 2Q 10-Q contained signed certifications pursuant to SOX by Immelt and Bornstein. The SOX certifications stated that the financial information

contained in the 2017 2Q 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting. Specifically, the certifications represented that the 2017 2Q 10-Q did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." The certifications also stated that Immelt and Bornstein had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information" and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting." Immelt's and Bornstein's statements were attributable to the Company.

46.    The statements referenced above in ¶¶ 32-45 were materially false and misleading because Defendants failed to disclose that: (1) the Company's various operating segments, including the Power and Oil & Gas segments, were underperforming Company projections, with order drops, excess inventories and increased costs; (2) GE Capital's long-term care reserves were understated by billions of dollars in violation of GAAP; (3) by materially under-reserving for liabilities related to GE Capital's legacy long-term care reinsurance policies, General Electric was able to maintain cash flow for its quarterly dividend payments; and (4) as a result of the foregoing, General Electric materially overstated its earnings and cash flows during the Class Period.

47.    On October 20, 2017, General Electric issued a press release, and filed the same on Form 8-K with the SEC, entitled "GE 3Q 2017 Earnings," summarizing the Company's

15

financial and operating results for the period ended September 30, 2017.  The Company

disclosed EPS of $0.29, falling below earnings estimates of $.49, slashing its cash flow

guidance by approximately 50 percent, and lowering its 2017 EPS guidance to $1.05 to $1.10

per share (vs. prior guidance of $1.60 to $1.70 per share).

48.     On the same day, the Company held a conference call to discuss its financial

results.   On the call, CEO Flannery, who had only recently assumed the chief executive

position, stated that the Company had been completing a review of its operations and that,

"[w]hile the company has many areas of strength, it's also clear from our current results that we

need to make some major changes with urgency and a depth of purpose. ***Our results are

unacceptable, to say the least***."

49.     General Electric blamed its disappointing results on its Power segment.  CEO

Flannery stated that General Electric's CFOA was primarily down due to "***lower than

anticipated Power volume which was resulted in lower earnings and higher inventory*** . . . ."

CFO Bornstein also provided additional details regarding the LTC policies held on GE Capital's

books, stating:

> [W]e have recently observed ***elevated claims experience*** for a portion of the long-
> term care [portfolio] at GE Capital's legacy insurance business, ***which represents
> $12 billion or roughly 50% of our insurance reserves***.
>
> * * *
>
> [GE] began a comprehensive review in the third quarter of premium deficiency
> assumptions that are used in the annual claims reserve adequacy test.  This is a
> very complex exercise, and the team is making good progress.  We expect to
> complete this process by the end of the year.

50.     General Electric further surprised the market by announcing that it had

suspended further dividends from GE Capital: "Until the review has been completed, ***we have***

*deferred the decision to pay approximately $3 billion of additional GE Capital dividends.* Year to date, GE Capital has paid $4 billion of dividends to GE."

51.     On this news, the Company's stock price fell $1.51 per share, or nearly 7 percent, to close at $22.32 per share on October 23, 2017.

52.     Despite the devastating revelations in the Power and GE Capital business segments regarding performance and cash flow sustainability, Defendants continued to make false and misleading statements to the market.  For example, during the same October 20, 2017 conference call, Defendants continued to tout its merger with Baker Hughes, as CFO Bornstein stated "As you know, we closed the [Baker Hughes] deal on July 3 . . . .  And *we believe the timing of the deal was right for both Baker and GE's shareholders* . . . .  *The synergy pipeline remains strong*, and the team continues to receive positive feedback from customers and employees."

53.     On October 30, 2017, the Company filed its quarterly report for the period ended September 30, 2017 on a Form 10-Q with the SEC (the "2017 3Q 10-Q").  The 2017 3Q 10-Q stated the Company's financial results and financial position.  In addition, the 2017 3Q 10-Q contained signed certifications pursuant to SOX by Flannery and Bornstein.  The SOX certifications stated that the financial information contained in the 2017 3Q 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting. Specifically, the certifications represented that the 2017 3Q 10-Q did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."  The certifications also stated that Flannery and Bornstein had disclosed "[a]ll significant deficiencies and material weaknesses in the design

17

or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information" and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting."  Flannery's and Bornstein's statements were attributable to the Company.

54.    The statements referenced above in ¶¶ 52-53 were materially false and misleading because Defendants failed to disclose that: (1) the Company's various operating segments, including the Power and Oil & Gas segments, were underperforming Company projections, with order drops, excess inventories and increased costs; (2) GE Capital's long-term care reserves were understated by billions of dollars in violation of GAAP; (3) by materially under-reserving for liabilities related to GE Capital's legacy long-term care reinsurance policies, General Electric was able to maintain cash flow for its quarterly dividend payments; and (4) as a result of the foregoing, General Electric materially overstated its earnings and cash flows during the Class Period.

55.    Finally, on November 13, 2017, General Electric held its Investor Update and stunned the market by slashing its annual dividend in half, from $0.96 to $0.48 per share, only the second dividend cut for General Electric since the Great Depression.  The Company stated that its dividend rate was no longer appropriate after realizing its industrial business did not grow as fast as previously expected.  Plagued by poor cash flow, CEO Flannery further explained General Electric had been paying out a dividend above its industrial free cash flow for a number of years, and that GE Capital would not be paying a dividend to General Electric in 2018, stating:

> [T]he reduction of this dividend to $0.48 is a product, really, of where we are as a
> company right now.  So we had a $0.96 dividend established.  We had a path

where we thought the industrial cash flow generation would grow, that would grow into the dividend . . . . The reality is that hasn't unfolded that way . . . . *[W]e've been paying a dividend in excess of our free cash flow for a number of years now*.

56.     CEO Flannery reiterated the Company's cash flow forecast reduction, stating:

**[Unidentified Participant]:** [S]hortly after you were named CEO, it was widely quoted in the Journal and elsewhere that the dividend was safe. Surprised that you would make such a strong statement early on, which . . . has hurt your credibility right out of the gate . . . . When did you make the decision?

**[Defendant Flannery]:** So I think *there's been major change in our cash flow forecast*. So the time we went out with that first statement, we were having a $12 billion to $14 billion CFOA. And the day I started, there was a guide to the low end of that range . . . . So we're now at a $7 billion number. . . . [F]undamentally, that *dividend was predicated on us growing to a certain level that we just did not see happening in terms of industrial cash flow* in the next couple of years . . . . So the single biggest delta, I think is obvious, which is what happened in the Power business.

57.     CEO Flannery also revealed for the first time that Defendants were considering divesting Baker Hughes as early as July 2019, the end of the two year lock-up period, despite touting synergies between General Electric's Oil & Gas segment and Baker Hughes as recently as October 20, 2017. CEO Flannery stated that "We've just appointed a committee of our board, . . . the Finance and Capital Allocation Committee. *[T]he first thing I've tasked them to work on is evaluating our exit options on Baker Hughes*." CEO Flannery claimed that "part of the deliberate thinking of [the merger with Baker Hughes] was to create optionality with that asset, and that's what we're evaluating right now."

58.     Current CFO Miller, who only recently assumed the role on November 1, 2017, also provided an update regarding the Company's review of its GE Capital insurance reserves, stating:

One area, I'll just pause and talk about for a minute is GE Capital and as many of you know we're in the middle of an ongoing reserve review at our insurance

19

businesses there. This process is ongoing, it involves multiple third parties and it's not done at this point and I don't have a number for you today.

We're on track to conclude that in December. ***And we mentioned to you before, that we're not taking a second half GE Capital dividend of about $3 billion. And as we go through this process at this point I do expect the charge to be more than that***. But we do have capital plans in place and we don't expect to have to put GE parent cash into GE Capital.

59.     Moreover, General Electric slashed its 2018 profit outlook to adjusted earnings of $1.00 to $1.07 a share, compared with its earlier estimate of $2 per share and announced a series of steps to save cash and refine operations, including revising compensation plans and shrinking the size of the Company's Board to 12 from 18 members.  In fact, CFO Miller indicated that General Electric would reduce its corporate workforce, which currently has approximately 24,000 employees, by 25 percent, or approximately 6,000 job cuts.

60.     As a result of these revelations, General Electric's stock price fell $1.47 per share, or over 7 percent, to close at $19.02 per share on November 13, 2017.

61.     Furthermore, on November 14, 2017, General Electric attended a Goldman Sachs Group Inc.-sponsored conference in which CFO Miller provided additional details regarding the Company's review of its GE Capital insurance reserves:

[W]e're in the middle of a review of our insurance reserves. ***This is a book of largely reinsured long-term care businesses back from more than a decade ago***. . . . It's on track for completion in December . . . .  We had announced earlier that ***we had deferred the decision on a GE Capital dividend of about $3 billion in the second half of the year.  At this point in the process, I'd tell you that I expect that charge to be more than that*** . . . .

62.     This imminent $3 billion plus charge on legacy insurance policies exceedingly dwarfs the $100 million charge that General Electric previously took in mid-2016.

63.     On this news, the Company's stock price fell an additional $1.12 per share, or 5.8 percent, to close at $17.90 per share on November 14, 2017.

64.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## CLASS ACTION ALLEGATIONS

65.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired securities of General Electric between December 15, 2016 and November 10, 2017, inclusive (the "Class Period").   Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of General Electric, and the directors and officers of General Electric and their families and affiliates at all relevant times.

66.     The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, General Electric common stock was actively traded on the NYSE.   While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by General Electric and/or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

67.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

68.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

69.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        (a)     whether the Exchange Act was violated by Defendants as alleged herein;

        (b)     whether statements made by Defendants misrepresented material facts about the business, operations and management of General Electric; and

        (c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

70.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

71.     The market for General Electric's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, General Electric's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired General Electric's securities relying upon the integrity of the market price of the

Company's securities and market information relating to General Electric, and have been damaged thereby.

72.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of General Electric's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  These statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about General Electric's business, operations, and prospects as alleged herein.

73.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about General Electric's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

74.    During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of General Electric securities, and operated as a fraud or

deceit on Class Period purchasers of General Electric securities by misrepresenting the value and prospects for the Company's business, growth prospects, and accounting compliance. Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of General Electric securities fell precipitously, as the prior artificial inflation came out of the price.  As a result of their purchases of General Electric securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**ADDITIONAL SCIENTER ALLEGATIONS**

75.     During the Class Period, as alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

76.     The Individual Defendants permitted General Electric to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's stock.

77.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding General Electric, their control over, receipt, and/or modification of General Electric's allegedly materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning General Electric, participated in the fraudulent scheme alleged herein.

24

78.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of General Electric securities by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme deceived the investing public regarding General Electric's business, operations, and management and the intrinsic value of General Electric securities and caused Plaintiff and members of the Class to purchase General Electric securities at artificially inflated prices.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

79.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of General Electric who knew that the statement was false when made.

## PRESUMPTION OF RELIANCE

80.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's stock traded in an efficient market;

(d)     the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)     Plaintiff and other members of the Class purchased General Electric securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

81.     At all relevant times, the markets for General Electric securities were efficient for the following reasons, among others:

(a)     as a regulated issuer, General Electric filed periodic public reports with the SEC;

(b)     General Electric regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)     General Electric was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d)     General Electric common stock was actively traded in an efficient market, namely the NYSE, under the ticker symbol "GE."

82.     As a result of the foregoing, the market for General Electric securities promptly digested current information regarding General Electric from all publicly available sources and reflected such information in General Electric's stock price.  Under these circumstances, all purchasers of General Electric securities during the Class Period suffered similar injury through their purchase of General Electric's securities at artificially inflated prices and the presumption of reliance applies.

83.     Further, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

84.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

85.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

86.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of General Electric securities during the Class Period.

87.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for General Electric securities.  Plaintiff and the Class would not have purchased General Electric securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

88.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of General Electric securities during the Class Period.

## COUNT  II

### For Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

89.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

90.     The Individual Defendants acted as controlling persons of General Electric within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their

power to control public statements about General Electric, the Individual Defendants had the power and ability to control the actions of General Electric and its employees.  By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.     Awarding rescission or a rescissory measure of damages; and

E.     Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  December 18, 2017                          Respectfully submitted,

   s/ *Christopher J. Keller*

**LABATON SUCHAROW LLP**
Christopher J. Keller
Eric J. Belfi
Francis P. McConville
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700

Facsimile:  (212) 818-0477
ckeller@labaton.com
ebelfi@labaton.com
fmcconville@labaton.com

*Counsel for Tampa Maritime Association-
International Longshoremen's Association
Pension Plan*

## CERTIFICATION

We, Wilbert Rowell and David Nelson, as Co-Chair of Tampa Maritime Association-International Longshoremen's Association Pension Plan ("TMA-ILA"), hereby certify as follows:

1.       We are fully authorized to enter into and execute this Certification on behalf of TMA-ILA. We have reviewed a complaint prepared against General Electric Company ("General Electric") alleging violations of the federal securities laws;

2.       TMA-ILA did not purchase securities of General Electric at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.       TMA-ILA is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary;

4.       TMA-ILA's transactions in General Electric securities during the Class Period are reflected in Exhibit A, attached hereto;

5.       TMA-ILA has not sought to serve as a lead plaintiff in any class action filed under the federal securities laws during the last three years;

6.       Beyond its pro rata share of any recovery, TMA-ILA will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

We declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 14th day of December, 2017.


_Wilbert Rowell_
Wilbert Rowell
Co-Chair of Tampa Maritime Association-International Longshoremen's Association Pension Plan

_David Nelson_
David Nelson
Co-Chair of Tampa Maritime Association-International Longshoremen's Association Pension Plan

## EXHIBIT A

### TRANSACTIONS IN GENERAL ELECTRIC COMPANY

| Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Purchase | 06/22/17 | 12,503.00 | $27.68 | ($346,039.28) |